**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

BOARD OF WATER WORKS
TRUSTEES OF THE CITY OF DES
MOINES, IOWA,

          Plaintiff,

vs.

SAC COUNTY BOARD OF
SUPERVISORS AS TRUSTEES OF
DRAINAGE DISTRICTS 32, 42, 65, 79,
81, 83, 86, and CALHOUN COUNTY
BOARD OF SUPERVISORS and SAC
COUNTY BOARD OF SUPERVISORS
AS JOINT TRUSTEES OF DRAINAGE
DISTRICTS 2 AND 51 and BUENA
VISTA COUNTY BOARD OF
SUPERVISORS and SAC COUNTY
BOARD OF SUPERVISORS AS JOINT
TRUSTEES OF DRAINAGE
DISTRICTS 19 and 26 and DRAINAGE
DISTRICTS 64 and 105,

          Defendants.

No. C 15-4020-MWB

**ORDER CERTIFYING QUESTIONS
TO THE IOWA SUPREME COURT**

_____

## TABLE OF CONTENTS

I.   INTRODUCTION.................................................................. 4
     A.   Factual and Historical Background................................. 4
          1.   Des Moines Water Works ...................................... 5
          2.   Drainage Districts .............................................. 7
     B.   Procedural Background .............................................. 9
     C.   Introduction to the Plaintiff's Argument..................... 10
     D.   Introduction to the Defendants' Argument .................. 11

II.  UNQUALIFIED IMMUNITY FOR DRAINAGE DISTRICTS ................. 12
     A.   The Defendants' Argument on Unqualified Immunity ................... 12
     B.   The Plaintiff's Argument on Unqualified Immunity...................... 13
          1.   DMWW's county home rule argument............................. 15
          2.   Equitable remedies and the rebuttable presumption ............... 20
          3.   Drainage   districts'   unqualified   immunity   is
               unconstitutional......................................................... 21

III. CERTIFICATION OF QUESTIONS TO THE IOWA SUPREME
     COURT ...................................................................... 22
     A.   Authorization and Standards for Certification of Questions ............. 22
     B.   Certification Analysis ........................................................ 25
     C.   Briefing Designation ......................................................... 25

IV.  CONCLUSION............................................................................ 26

This is an order certifying questions to the Iowa Supreme Court. On December 7, 2015, by Order (docket no 46), I *sua sponte* instructed the parties in this case to submit a Joint Report Respecting Certification of Issues to the Iowa Supreme Court (docket no. 47), which the parties filed on December 14, 2015. I raised this matter *sua sponte* because this case may turn on a number of unresolved questions of Iowa law. The answers to these questions are critical to resolving the defendants' Motion for Partial Summary Judgment (docket no. 34), which is currently pending before me. Because this case may raise issues of first impression under Iowa law, that should, under the circumstances, be decided by the Iowa Supreme Court, I conclude that I should certify the following questions, which the parties agree have arisen in this case, to the Iowa Supreme Court:

2

**Question 1**

As a matter of Iowa law, does the doctrine of implied immunity of drainage districts as applied in cases such as *Fisher v. Dallas County*, 369 N.W.2d 426 (Iowa 1985), grant drainage districts unqualified immunity[1] from all of the damage claims set forth in the Complaint (docket no. 2)?

**Question 2**

As a matter of Iowa law, does the doctrine of implied immunity grant drainage districts unqualified immunity from equitable remedies and claims, other than mandamus?

**Question 3**

As a matter of Iowa law, can the plaintiff assert protections afforded by the Iowa Constitution's Inalienable Rights, Due Process, Equal Protection, and Takings Clauses against drainage districts as alleged in the Complaint?

**Question 4**

As a matter of Iowa law, does the plaintiff have a property interest that may be the subject of a claim under the Iowa Constitution's Takings Clause as alleged in the Complaint?

---

[1] In its filings, the plaintiff uses its own term "unqualified immunity," rather than the more commonly accepted term "absolute immunity." To my knowledge, the term "unqualified immunity" does not appear in any opinions published by the Iowa Court of Appeals or Iowa Supreme Court. I take it to mean something synonymous with absolute immunity. At oral argument, the plaintiff stated that this distinction was deliberate. The plaintiff explained that, although the Iowa Supreme Court has not gone so far as to characterize the immunity of drainage districts as absolute, the court has never expressed under what circumstances immunity to suit in tort would *not* be applicable. So, the plaintiff chose to call this *de facto* absolute immunity, "unqualified immunity." I use the term "unqualified immunity" in this Order to remain consistent with the word choice in the parties' Joint Report Respecting Certification of Issues to the Iowa Supreme Court.

Whether I grant the defendants' Motion for Partial Summary Judgment will depend on the answers to these questions. "A certification order shall set forth . . . a statement of facts relevant to the questions certified, showing fully the nature of the controversy in which the questions arose." Iowa Code § 684A.3.

## I.    INTRODUCTION

The state of Iowa's largest municipal water utility provider, providing drinking water to an estimated half million customers in the Des Moines area, alleges state tort claims and federal and state statutory and constitutional claims against ten upstream drainage districts[2] and three upstream County Board of Supervisors as Trustees of the Drainage Districts. This is a case about which political subdivision of Iowa must cover the costs of complying with federal and state clean water regulations due to increased nitrate levels, beyond the maximum allowed by law, in the water flowing downstream that is used by the State's largest municipal water utility.

### A.    Factual and Historical Background

The two following facts, relevant to the parties' purely legal arguments, are undisputed: the plaintiff is a water utility organized and acting under Iowa Code Section 388; and the defendants are drainage districts under Iowa Code Chapter 468 and Article I, Section 18 of the Iowa Constitution. The facts below are undisputed or denied for lack of information. The following two sections are not intended to be findings of fact for the

---

[2] Although thirteen drainage districts are captioned, plaintiff counts them as ten. Not immediately apparent from the case caption is that the following sets of two drainage districts are treated as single or overlapping units: 2 and 51; 19 and 26; 64 and 105. Plaintiff's Exhibit 2 (docket no. 2-2) clarifies this with a map of the drainage districts.

4

purposes of summary judgment, but are included to give context to the parties' arguments.

### 1. Des Moines Water Works

The Board of Water Works Trustees of the City of Des Moines, Iowa, also known as the Des Moines Water Works ("DMWW") is a municipal water utility, organized and acting under Iowa Code Chapter 388, providing drinking water to an estimated, a half million Iowans in the Des Moines area, both by direct service and by wholesale service to other utilities and districts. DMWW obtains its raw water supply primarily from the Raccoon and Des Moines Rivers. The Raccoon River drains about 2.3 million acres from portions of seventeen Iowa counties, including Buena Vista, Sac, and Calhoun. It flows approximately 186 miles from its origin in Buena Vista County to its mouth, south of downtown Des Moines, and its confluence with the Des Moines River, which is a tributary of the Mississippi River Basin, draining into the Gulf of Mexico.

Under the Safe Drinking Water Act ("SDWA"), 42 U.S.C. §§ 300(f)-300(j) (1996), DMWW is obligated to meet the maximum contaminant level standards set by the Environmental Protection Agency ("EPA") in the water it serves to consumers. The SDWA is the key federal law for protecting public water supplies from harmful contaminants. Section 300(g)(1), as amended in 1996, directs the EPA to select contaminants for regulatory consideration based on occurrence, health effects, and meaningful opportunity for health risk reduction. For each contaminant that the EPA determines requires regulation, the EPA must set a non-enforceable maximum contaminant level goal at a level at which no known or anticipated adverse health effects occur and which allows an adequate margin of safety. The EPA must then set an enforceable standard, a maximum contaminant level ("MCL"), as close to the goal as is feasible using best technology, treatment techniques, or other means available, taking costs into consideration. The EPA's maximum contaminant level for nitrate, promulgated

5

in 2012 and currently in force, is 10 mg/L, which is very close to the equivalent of 10 parts per million. Nitrate is a soluble ion of Nitrogen, found in soil, which only moves out of the soil when drawn out by the flow of water. The health risks associated with nitrate contamination include blue baby syndrome and potential endocrine disruption impacts.

In its Complaint, DMWW states that from 1995 to 2014, nitrate concentrations in the Raccoon River at the DMWW intake points exceeded the 10 mg/L standard for drinking water at least 1,636 days or 24% of the time. In 2013 and 2014, persistent peaks in nitrate levels reached record highs, with the Raccoon River reaching 24 mg/L and the Des Moines River reaching 18.6 mg/L. In July 2014, the average nitrate concentration in the Des Moines and Raccoon Rivers was 11.98 mg/L, the third highest average in the last forty years. Similarly, in September, October, November, and December 2014, the average nitrate concentration was 11.89 mg/L, 13.23 mg/L, 13.43 mg/L, and 12.56 mg/L, respectively.

DMWW states that it utilizes three water treatment plants to process raw water into drinking water. These three treatment plants, the McMullen Plant, Saylorville Plant, and Fleur Plant, all draw water from the Raccoon River. DMWW has managed excess nitrates in the raw water it processes in several ways. A fraction of the water at the Fleur Plant undergoes an ion exchange process to remove nitrate and the water is blended with post-filtered water to stay below the EPA's 10 mg/L standard. In addition to drawing water from the Raccoon River, the McMullen Plant draws water from Crystal Lake, which is a river-influenced surface water source managed to provide reduced nitrogen water through natural biologic processes. DMWW also has the ability to blend the water from the McMullen Plant with nitrate-free water drawn from a reservoir, which is used as an emergency backup water source. The Saylorville Plant is the only plant operated by DMWW that has a limited capacity to remove nitrate. Additionally, DMWW has an

6

ion exchange nitrate removal facility that it operates as needed at a cost of approximately $4,000-$7,000 per day.[3]

DMWW utilized this nitrate removal facility continuously, due to excessive nitrate levels, until March 10, 2015. The continuous operation, for a total of 96 days, is the longest in the history of the facility's operation during the winter season. DMWW states that, due to the age and limited capacity of the existing nitrate removal facility, it will need to design and construct a new nitrate removal facility with a 50 million gallon per day capacity at a cost of between $76 million and $183.5 million before 2020. Operation and maintenance costs will be in addition to the initial estimated capital cost.

### 2. *Drainage Districts*

Drainage districts were formed to allow wetlands to be turned into agricultural lands. The purpose of drainage districts in Iowa can be traced back to the late 1800s and early 1900s. *See* Swamp Lands Act of 1850; *Hatch, Holbrook & Co. v. Pottawattamie Co.*, 43 Iowa 442 (1876); Thirteenth Amendment to the Iowa Constitution of 1908. There were vast areas of flat land that were unable to be farmed due to inadequate drainage. Iowa Code Chapter 468 and Iowa Constitution Article I, § 18 established drainage districts as they exist under Iowa law currently. Drainage districts are a funding mechanism property owners establish to levy for drainage improvements. *Fisher v. Dallas Cty.*, 369 N.W.2d 426, 428-29 (Iowa 1985). For a drainage district to be established, at least two land owners must petition for its creation. IOWA CODE § 468.6. "The right of a landowner to place tiles in swales or ditches to carry the water from ponds upon and onto lower lands . . . is necessary [ ] in order that low and swampy lands may

---

[3] It is unclear from DMWW's filings whether this nitrate removal facility is located at one of its water treatment plants or treats water received from all plants. DMWW indicates that its nitrate removal facility removes nitrate from its finished water. *See* Complaint ¶¶ 69-95.

be reclaimed, and a denial thereof would be productive of incalculable mischief." *Dorr v. Simmerson*, 103 N.W. 806, 807 (1905). The affairs of drainage districts are managed by the county board of supervisors in a representative capacity. *See* IOWA CODE §§ 468.37, .89, .231, .232, .617. If a repair exceeds $50,000, a hearing is required to determine advisability and appeal is allowed. IOWA CODE § 468.126(1)(c). Similarly, improvements exceeding a certain amount can be stopped through a process called remonstrance. IOWA CODE § 468.126(4)(e).

Drainage districts are something of a collective passive utility system, limited to the public whose land is affected. As such, drainage districts "have only such limited power as the legislature grants them . . . ." *Reed v. Muscatine-Louisa Drainage Dist. No. 13*, 263 N.W.2d 548, 551 (Iowa 1978). Iowa's legislature concluded drainage from agricultural and other lands shall be presumed to benefit the public:

> The drainage of surface waters from agricultural lands and all other lands, including state-owned lakes and wetlands, or the protection of such lands from overflow shall be presumed to be a public benefit and conducive to the public health, convenience, and welfare.

> The provisions of this subchapter and all other laws for the drainage and protection from overflow of agricultural or overflow lands shall be liberally construed to promote leveeing, ditching, draining and reclamation of wet, swampy, and overflow lands.

IOWA CODE § 468.2(1) and (2).

The ten defendant drainage districts are located in the North Raccoon watershed and the Des Moines Lobe geographic formation. The primary purpose of the drainage district infrastructure is to remove water from agricultural lands. Private subsurface tiles convey water to subsurface tiles, pipe, subsurface ditches, and channels, created and

8

maintained by the defendants, which in turn convey water to streams and rivers, and ultimately the Raccoon River.

## B. Procedural Background

On March 16, 2015, the plaintiff, Board of Water Works Trustees of Des Moines, Iowa, also known as the Des Moines Water Works, filed their Complaint (docket no. 2). On May 22, 2015, the defendants, Sac, Calhoun, and Buena Vista County Boards of Supervisors as Trustees of the defendant drainage districts and ten defendant drainage districts, filed their Amended Answer to Complaint (docket no. 12).

On September 24, 2015, the defendants filed their Motion for Partial Summary Judgment (docket no. 34). On October 19, 2015, DMWW filed its Resistance of Board of Water Works Trustees of the City of Des Moines, Iowa to Defendants' Motion for Partial Summary Judgment and Request for Oral Argument ("DMWW's Resistance") (docket no. 35). DMWW's request for Oral Argument was granted by Order (docket no. 37) on October 27, 2015, and oral arguments were originally scheduled for December 16, 2015, but then rescheduled and held on December 21, 2015, by Order (docket no. 44). On November 20, 2015, the defendants filed their Reply Brief in Support of Their Motion for Partial Summary Judgment (docket no. 42). On December 7, 2015, by Order (docket no. 46), I instructed the parties to meet, confer, and come to an agreement on the identification and description of state law issues that exist in this case that could be certified to the Iowa Supreme Court and, for the parties to explain whether they believed these issues should be certified. On December 14, 2015, the parties filed a Joint Report Respecting Certification of Issues to the Iowa Supreme Court (docket no. 47) ("Joint Certification Report"). Ordering opposing attorneys to work together, especially with out of state firms, does not often end with such positive results. Here, with two highly regarded and respected Iowa law firms and lawyers, in the style of Iowa lawyers,

9

extremely zealous advocates but dedicated to civility and professionalism, they met, conferred, and did a wonderful job producing exactly what this important litigation needed: agreement of certified questions of state law. The defendants argue against the certification of the questions above, principally because certification of these questions would require the Iowa Supreme Court to revisit well-settled precedent regarding drainage district immunity in tort, not novel questions of state law.

### C. Introduction to the Plaintiff's Argument

DMWW's Complaint alleges ten causes of action: Count I for violation of various federal statutes known as the Clean Water Act; Count II for violation of Iowa Code § 455B ("a pollutant shall not be disposed of by dumping, depositing, or discharging such pollutant into any water of the state"); Count III for public nuisance; Count IV for statutory nuisance; Count V for private nuisance; Count VI for trespass; Count VII for negligence; Count VIII for taking without just compensation in violation of the Fifth Amendment of the United States Constitution as made applicable by the Fourteenth Amendment and in violation of Article I, § 18 of the Constitution of the State of Iowa; Count IX for violation of due process and equal protection in violation of the Fourteenth Amendment of the United States Constitution and the Due Process and Equal Protection Clauses of the Iowa Constitution; and Count X for permanent, prospective injunctive relief.

DMWW essentially argues that the defendants are responsible for the increasing nitrate concentrations in the Raccoon River. DMWW is forced to operate its current nitrate removal facility, and may be forced to construct a new, higher capacity nitrate removal facility, to comply with the SDWA. DMWW's tort, state and federal constitutional claims are derivative of its claim that the drainage districts are responsible for the increasing level of nitrate in the water it must process.

### D.     Introduction to the Defendants' Argument

The defendants raise sixteen affirmative defenses.[4]   The defendants advance several arguments based on justiciability or jurisdiction: (1) that defendants are not a proper party to this suit; (2) the relief sought by plaintiff is, in part or in whole, within the particular expertise of, and is being addressed by, federal and state governments and their relevant agencies such as the United States EPA and the Iowa Department of Natural Resources and, thus, this court should decline to exercise jurisdiction over this matter pursuant to the doctrine of primary jurisdiction; and that some or all of the plaintiff's claims are barred by: (3) the Political Question Doctrine; (4) preemption by state and/or federal law; and (5) by the plaintiff's failure to exhaust administrative remedies.

The defendants further argue that (6) they are immune from plaintiff's claims pursuant to Iowa law.  Additionally, the defendants argue that some or all of the plaintiff's claims are barred by: (7) the Clean Water Act and Iowa's Code; (8) Iowa Code § 455E.6; (9) the applicable statutes of limitations; (10) the doctrine of laches; (11) the Doctrine of Prescriptive Easement; (12) to the extent that the plaintiff has failed to mitigate and/or minimize their damages, if any; and based on (13) assumption of risk.

The defendants also argue that plaintiff's claimed injuries were caused in whole or in part by (14) Acts of God or by (15) others whose actions were not controlled by or related to defendants, and that such actions are the superseding, supervening and/or intervening cause of plaintiff's injuries and/or damages, therefore, plaintiff may not recover from defendants as a matter of law.

Finally, the defendants argue that (16) comparative fault may apply to some or all of plaintiff's negligence claims, which would reduce or bar such claims.

---

[4] The defendants' affirmative defenses have been renumbered from their presentation in defendants' Amended Answer to correspond to the order in which the arguments are addressed in this Order and Opinion.

## II.  UNQUALIFIED IMMUNITY FOR DRAINAGE DISTRICTS

Central to the analysis of defendants' Motion for Summary Judgment on plaintiff's Counts III through VII for public nuisance, statutory nuisance, private nuisance, trespass, and negligence is that "[t]he drainage district is not such a legal entity as is known to or recognized by law as a proper party to adversary proceedings." *Gish v. Castner-Williams & Askland Drainage Dist.*, 136 Iowa 155, 113 N.W. 757 (1907). Thus, "a drainage district could not be subject to a money judgment in tort under any state of facts." *Fisher*, 369 N.W.2d at 430; *see also Board of Supervisors v. District Court*, 229 N.W. 711, 712 (Iowa 1930); *Maben v. Olson*, 175 N.W. 512, 516 (Iowa 1919); *Chicago Cent. & Pacific R. Co. v. Calhoun Cty. Bd. of Super.*, 816 N.W.2d 367, 371-72 (Iowa 2012). "The limited nature of a drainage district's purposes and powers are, therefore, reflected in the limited circumstances in which a drainage district is subject to suit." *Fisher*, 369 N.W.2d at 429.

### A.  The Defendants' Argument on Unqualified Immunity

The defendants argue that they are not a proper party to this suit or at least a number of these claims. They argue that this is based on clear, longstanding, and overwhelming precedent, which establishes that Iowa does not recognize drainage districts as anything more than vehicles to effectuate the Iowa Legislature's intent to allow property owners to join together to make land productive through drainage. Drainage districts exist solely to do what the Legislature created them to do, within the parameters the Legislature established. Because the existence and functions of drainage districts are so limited, the Iowa Supreme Court repeatedly, for over a century, has found districts not amenable to suit for damages, i.e., they are entitled to unqualified immunity. The defendants characterize DMWW's argument to allow suit, as an argument for why the

law should be different than it is; that the United States Supreme Court, the Iowa Supreme Court, the Iowa Legislature, the Eighth Circuit Court of Appeals, the Sixth Circuit Court of Appeals, and everyone else to have addressed these issues, are wrong. The defendants point out that DMWW does not allege that any named drainage district did anything, other than exactly what the Iowa Legislature designed and created them to do. Each drainage district fulfilled its function under Iowa Code Chapter 468. The defendants characterize DMWW's argument as properly directed at the Iowa Legislature: DMWW is asking whether drainage districts *should* do what the Legislature directed, not *whether* they do it. Whether the drainage districts should do what the Legislature compels them to do, however, is not a debate to be held with the drainage districts themselves. Drainage districts have no power to do anything other than what the Legislature requires them to do. Therefore, they argue, the defendants are not a proper party to this suit, and this is a debate to be had with the Iowa Legislature.

### B. The Plaintiff's Argument on Unqualified Immunity

DMWW states that the defendants have overlooked issues regarding implied immunity, or "unqualified immunity" in DMWW's terms, for drainage districts that have not yet been considered by an Iowa appellate court. DMWW requests that I reconsider unqualified immunity for drainage districts, through Iowa law, based on the special facts and circumstances of this case. DMWW argues that the question of whether it has the power to possess and assert constitutional rights as a matter of law should begin with its governing statute, which grants it the express power to be "a party to legal action" and the right to "exercise all powers of a city," with respect to its utility and limited exceptions. IOWA CODE § 388.4. It argues these powers should be read expansively

13

under the counties home rule, found in Article III § 39A, and the municipal home rule,[5] found in § 38A of the Iowa Constitution, but must be understood to not include the power of taxation. IOWA CODE § 388.4(1). DMWW further argues that Iowa would likely recognize a private cause of action based on a violation of the Iowa constitution, relying on *Peters v. Woodbury Cnty.*, 979 F. Supp. 2d 901, 971 (N.D. Iowa 2013) *aff'd sub nom. Peters v. Risdal*, 786 F.3d 1095 (8th Cir. 2015).[6]

DMWW's argument to overcome the drainage districts' unqualified immunity in tort can be divided into three main points, with the second point including two sub-arguments: (1) unqualified immunity for drainage districts is no longer good law and should be changed because the enactment of the county home rule undermines the rationale for unqualified immunity, which is based on limited powers; (2) unqualified immunity is not applicable here because (a) equitable remedies may be obtained against drainage districts beyond a mandamus action, or (b) the statutory presumption that drainage districts are for public benefit may be rebutted here, thereby piercing unqualified immunity in tort; and (3) it would be unconstitutional to apply unqualified immunity. At oral arguments, DMWW clarified that it chose the term "unqualified immunity," rather than one of the more common terms, "absolute immunity" or "qualified immunity," because the courts of Iowa have not clarified which is applicable. *See* footnote 1 of this Order.

---

[5] DMWW uses the term "county home rule" as a catchall term for both rules, see "DMWW's county home rule argument" section below for an explanation of these rules.

[6] This issue was recently considered by the Iowa Court of Appeals in *Conklin v. State*, 863 N.W.2d 301 (Iowa App. 2015), relying on the analysis in *Meinders v. Duncan Cmty. Sch. Dist.*, 645 N.W.2d 632, 635 (Iowa 2002). However, this decision is currently under consideration by the Iowa Supreme Court.

14

### 1. *DMWW's county home rule argument*

To support their first argument, that the rule for unqualified immunity is outdated, DMWW lays out the extensive history and development of drainage districts under Iowa law, some of which has been incorporated into the Factual Background section of this Order and Opinion. DMWW states, to summarize this argument, that,

> The gravamen of the case law [supporting immunity] emerged in the beginning of the twentieth century, and remained essentially unchanged ever since, was a judicially created doctrine of immunity from monetary claims, not based on any explicit statutory immunity and not based on the doctrine of sovereign immunity, but rather on concepts of (1) limited existence and (2) limited powers in pursuit of a presumed benefit to public health and welfare. . . . The rule of immunity from damages persisted unexamined, and unchanged, and even survived the enactment of a municipal tort claims act that would have seemed by its text to cover all "political subdivisions" including drainage districts. . . . The history demonstrates that implied immunity has survived through repetition rather than critical analysis.

DMWW's Resistance, 12-13. DMWW notes the maxim that when the reason for a common law rule ends, so should the rule, citing *Koenig v. Koenig*, 766 N.W.2d 635, 645 (Iowa 2009); *Utility Air Regulatory Group v. E.P.A.*, --- U.S. ---, 134 S. Ct. 2427, 2452 (U.S. 2014) (Breyer., J, concurring); *Funk v. U.S.*, 290 U.S. 371, 381-382 (1933).

"The proposition or rule of law that a county or joint county-municipal corporation government possesses and can exercise only those powers granted in express words is not part of the law of this state." Iowa Const. Art. III, § 39A. The sections of the Iowa constitution regarding the municipal and home rule are available below:

> Municipal home rule. SECTION 38A. Municipal corporations are granted home rule power and authority, not inconsistent with the laws of the General Assembly, to determine their local affairs and government, except that they

shall not have power to levy any tax unless expressly authorized by the General Assembly.

The rule or proposition of law that a municipal corporation possesses and can exercise only those powers granted in express words is not a part of the law of this state.

IOWA CONST. amend. XXV.

Counties Home Rule. SECTION 39A. Counties or joint county-municipal corporation governments are granted home rule power and authority, not inconsistent with the laws of the general assembly, to determine their local affairs and government, except that they shall not have power to levy any tax unless expressly authorized by the general assembly. The general assembly may provide for the creation and dissolution of joint county-municipal corporation governments. The general assembly may provide for the establishment of charters in county or joint county-municipal corporation governments.

If the power or authority of a county conflicts with the power and authority of a municipal corporation, the power and authority exercised by a municipal corporation shall prevail within its jurisdiction.

The proposition or rule of law that a county or joint county-municipal corporation government possesses and can exercise only those powers granted in express words is not a part of the law of this state.

IOWA CONST. amend. XXXIX.

DMWW's argument that unqualified immunity in tort for drainage districts based on a rationale of limited existence cannot stand in the face of the expansive powers granted by the county home rule. In the 1972 session of the Iowa General Assembly, a bill was passed, commonly known as the "home rule bill," as an attempt to implement

16

the concept of home rule which was added to Iowa's constitution by amendment in 1968. 64.2 IOWA H. JOUR. 172-183, (Jan. 26, 1972); Iowa Const. Art. III, § 40 (1968).

DMWW argues that the application of the county home rules extends to drainage districts based on Iowa Code §§ 468.1 and 468.500. Section 468.500 authorizes a drainage or levee district to be placed under the control and management of a board of trustees by the city council. Section 468.1 authorizes the board of supervisors of any county to establish drainage districts. DMWW also cites three Iowa Attorney General Opinions to show that drainage districts have powers beyond the limited express powers granted by the Iowa Legislature. Although the Iowa Opinion of the Attorney General to Mr. Martin on March 13, 1980, certainly supports the argument that the application of the County Home Rule Amendment extends to drainage districts, it is not binding authority on this court. The resounding insistence of the Iowa Supreme Court and Iowa Court of Appeals that the legal existence of drainage districts is so limited as to grant unqualified immunity to awarding money damages in a tort action against them, drowns out the thirty-five year old whisper of the Iowa Attorney General's office, which merely suggests a weakness in the foundation upon which unqualified immunity is built.

"[Iowa courts'] more recent cases have continued to recognize that there are 'limited circumstances in which a drainage district is subject to suit' and that the legislature has 'sharply restrict[ed] the circumstances in which the affairs of a drainage district are subject to judicial action.'" *Chicago Cent. & Pac. R.R. Co. v. Calhoun County Bd. of Supervisors*, 816 N.W.2d 367, 374 (Iowa 2012) (quoting *Fisher*, 369 N.W.2d at 429). "[Iowa's courts'] cases have consistently held that a drainage district is not susceptible to suit for money damages. It has no corporate existence for that purpose." *Id.* The court in *Chicago Cent.* went on,

> Our previous interpretations of chapter 468 [of the Iowa Code] provide that if a party believes a board of supervisors is not performing its statutory duty to keep a drainage

17

> improvement in repair, that party's remedy is a mandamus
> action to compel the board to perform its duty. We have
> recognized this remedy for over sixty years. The legislature
> has not responded to our interpretation of this aspect of the
> drainage district statutes, indicating its tacit acceptance of
> mandamus as the appropriate remedy for board inaction. We
> see no reason to abandon our previous holdings that, in
> situations such as the one before us, mandamus is the proper
> remedy.

816 N.W.2d at 375 (citations omitted). The county home rule has been in effect since at least 1972 in Iowa. The Iowa Supreme Court and Iowa Court of Appeals have heard at least seventy cases concerning drainage districts since the enactment of the county home rule and have consistently found that the limited nature of drainage districts does not make them amendable to suit except in a mandamus action.

DMWW argues that a court has not considered the application of the county home rule in the context of unqualified immunity for drainage districts. However, the Iowa Supreme Court recently analyzed the relationship between unqualified immunity in tort, for the limited nature of an entity, despite the application of the county home rule, and an alleged violation of Equal Protection. *Doe v. New London Cmty. Sch. Dist.*, 848 N.W.2d 347 (Iowa 2014). In *New London*, the Iowa Supreme Court discussed the rational basis that exists for the legislature to place, within reason, greater limits on legal claims against municipalities than on legal claims against private entities. *Id.* at 357. "Claims against municipalities, unlike claims against private entities, are ultimately paid for by residents of those municipalities." The court bolstered its argument in favor of unqualified immunity for municipal entities by citing *Gard v. Little Sioux Intercounty Drainage Dist.*, 521 N.W.2d 696, 699 (Iowa 1994) (finding a rational basis for the immunity of drainage districts but not municipalities from tort claims, given "the limited nature of drainage district's purposes and powers"). In *Doe v. New London*, the court

noted that they had already decided that it did not violate the Equal Protection Clause of either the Iowa or United States Constitutions for a discovery rule to be available under the Iowa Tort Claims Act, but not the Iowa Municipal Tort Claims Act. They explained, "[d]espite home rule, counties operate under greater fiscal constraints than the state does. Their main source of revenue is property tax. The property tax levy is subject to a statutory ceiling." (quoting *Farnum v. G.D. Searle & Co.*, 339 N.W.2d 293, 397 (Iowa 1983)). That is to say, the court held that the limited nature of counties, which served as the basis for unqualified immunity in tort, was undisturbed by the application of the home rule. Drainage districts are under even greater restrictions with respect to their ability to generate revenue.

DMWW goes on to argue that the county home rule undermines the rationale for immunity. DMWW begins with the proposition that the unqualified immunity doctrine is predicated upon the concept that drainage districts only have the limited powers expressly granted by statute. DMWW argues that the grant of county home rule in 1978 fundamentally changed the nature and existence of drainage districts, such that the powers of drainage districts are not, in fact, limited any more. DMWW argues that the amendment to the Iowa Constitution granting counties home rule authority, and a corresponding amendment for municipalities in Iowa Const. Art. III, § 38A, means that political subdivisions in Iowa have "self-executing" authority. In summarizing what "self-executing" authority means, DMWW quotes that, "cities were given the power to act in certain areas without the need for statutory grants of authority from the legislature." DMWW's Resistance, 16 (quoting Sam F. Scheidler, *Survey of Iowa Law: Implementation of Constitutional Home Rule in Iowa*, 22 Drake L. Rev. 294 (1973)). DMWW relies on Iowa Code §§ 468.1 and 468.500 to extend the application of the county home rule to drainage districts. DMWW states that this means, political subdivisions should be presumed to have authority to act, whereas previous to the

19

enactment of the county home rule, the presumption was that political subdivisions could not act. DMWW further argues that this means political subdivisions enjoy freedom to act outside the boundaries of their statutes unless circumscribed by the limited conditions contained in Iowa Const. Art. III, §§ 38A, 39A. Because drainage districts are political subdivisions, the freedom and the existence of expanded powers is completely at odds with the rationale of an immunity doctrine based on limited powers. DMWW's Resistance, 17. Thus, DMWW argues, unqualified immunity should be reexamined and modified to fit the current usage because no Iowa case dealing with drainage districts makes any mention of Iowa Const. Art. III § 39A. DMWW clarifies that *Fisher* cited Iowa Const. Art. I, § 18, but did not address county home rule because the parties did not raise Iowa Const. Art. III, § 39A. Specifically, DMWW contends that the defendants ignore both the modern status of Iowa county home rule entities and the difference between Iowa and federal constitutional law.

### 2. *Equitable remedies and the rebuttable presumption*

DMWW's second argument, that unqualified immunity is not applicable in this case, is based on two propositions: (a) equitable remedies may be obtained against drainage districts, and (b) that the presumption that drainage districts are for the public benefit is rebutted here. DMWW argues that the closest this judicially created unqualified immunity gets to a statutory anchor is in Iowa Code § 468.2, which presumes that drainage is in the interest of the public health and welfare. If this unqualified immunity is based on a presumption, which can be rebutted, the immunity is properly characterized as qualified, but because Iowa courts have never found a qualification applicable, the immunity of drainage districts can be characterized as "unqualified."

Additionally, DMWW argues that it has found no controlling Iowa precedent to determine whether a drainage district is liable for downstream pollution. It argues that this is a material distinction between the prior unqualified immunity cases and the case,

here, involving public health issues. Thus, this set of facts, presenting novel public health issues, may rebut the statutory presumption that drainage districts promote public health found in Iowa Code § 468.2. DMWW argues that, since the enactment of environmental water laws, some seventy-five years after the enactment of the drainage district laws, there has been a shift in favoring the interest of human rights over those of property. It also argues that the calculus, determining acceptable costs for progress, has changed from the time the unqualified immunity doctrine was being developed. There is a much greater understanding of the adverse health impacts of environmental pollution, today, than there was seventy-five years ago. DMWW argues that the presumption for the public benefit, which confers unqualified immunity to drainage districts, may be rebutted in this very narrow context, that of environmental pollution, so as to only apply to this case and not overturn deeply rooted Iowa precedent.

DMWW clarifies in Section IV of the Joint Certification Report that it is not asking me or the Iowa Supreme Court to overrule established precedent and ignore *stare decisis*. DMWW only seeks to resolve a question that the Iowa Supreme Court has never addressed – whether unqualified immunity for drainage districts may be rebutted, if it is anchored in the statutory presumption of Iowa Code § 468.2, under the facts of this case.

### 3.    *Drainage districts' unqualified immunity is unconstitutional*

Finally, DMWW argues, if this court follows the longstanding precedent, that Iowa law has determined drainage districts to be immune under any set of facts for damages in tort; that would be a violation of its constitutional rights. DMWW argues that granting drainage districts unqualified immunity would violate state and federal equal protection and due process rights, pursuant to 42 U.S.C. § 1983, and that it would also deny certain inalienable rights. It argues that state immunity does not apply to claims asserted pursuant to § 1983, relying on *Jaeger v. Dubuque County*, 880 F. Supp. 640,

648 (N.D. Iowa 1995) and *Honeywell v. Village of Lakeside*, 640 F. Supp. 932, 935 n.2 (W.D. Mo. 1985) (citing *Nix v. Sweeny*, 573 F.2d 998 (8th Cir. 1978).

DMWW argues that the rule of unqualified immunity for drainage districts creates a classification scheme between different tort victims, which is often the subject of scrutiny on equal protection grounds, relying on *Bierkamp, 293 N.W.2d at 585; Miller v. Boone Cnty. Hosp.*, 394 N.W.2d 776, 776-77 (Iowa 1986). But, it notes that a similar argument has already been rejected by the courts in *Gard* and *Fisher*. DMWW argues that *Gard* can be distinguished because the court did not consider the power-enlarging implications of the county home rule nor public health considerations. In turn, drainage districts cannot meet the standards of even a rational basis level of review in an equal protection challenge if unqualified immunity is based on limited powers, and their powers are not, in fact, limited. DMWW further argues that, if drainage districts are granted unqualified immunity, this would violate DMWW's right to due process under the United States Constitution because the drainage districts' unqualified immunity is based on a false presumption of the benefit of public health. DMWW argues that drainage districts' unqualified immunity to claims would deny their inalienable rights under the Iowa constitution, which is similar to their equal protection and due process claims under the United States Constitution, relying on *Gacke*, 684 N.W.2d at 176.

## III.  CERTIFICATION OF QUESTIONS TO THE IOWA SUPREME COURT

### A.  *Authorization and Standards for Certification of Questions*

Both Iowa law and this court's Local Rules permit me, on the motion of a party or *sua sponte*, to certify a question of state law to the Iowa Supreme Court. Iowa's certification statute provides:

> The supreme court may answer questions of law certified to it by the supreme court of the United States, a court of appeals of the United States, a United States district court or the highest appellate court or the intermediate appellate court of another state, when requested by the certifying court, if there are involved in a proceeding before it questions of law of this state which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of the appellate courts of this state.

IOWA CODE § 684A.1.

Local Rule 83 of the Northern District of Iowa provides:

> When a question of state law may be determinative of a cause pending in this court and it appears there may be no controlling precedent in the decisions of appellate courts of the state, any party may file a motion to certify the question to the highest appellate court of the state. The court may, on such motion or its own motion, certify the question to the appropriate state court.

N.D. Ia. L.R. 83.

The United States Supreme Court has recognized that "[c]ertification procedure [ ] allows a federal court faced with a novel state-law question to put the question directly to the State's highest court, reducing delay, cutting the cost, and increasing the assurance of gaining an authoritative response." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 76 (1997); *see Lehman Bros. v. Schein*, 416 U.S. 386, 391 (1974) (by certifying a question of state law, the federal court may save "time, energy and resources and hel[p] build a cooperative judicial federalism"). Thus, "[t]aking advantage of certification made available by a State may 'greatly simplif[y]' an ultimate adjudication in federal court." *Arizonans for Official English*, 520 U.S. at 76 (citing *Bellotti v. Baird*, 428 U.S. 132, 151 (1976)).

Whether a federal district court should certify a question of state law to the state's highest court is a matter "committed to the discretion of the district court." *Allstate Ins.*

*Co. v. Steele*, 74 F.3d 878, 881-82 (8th Cir. 1996); *Schein*, 416 U.S. at 391 ("[Certification's] use in a given case rests in the sound discretion of the federal court."); *see Babinsky v. American Family Ins. Group*, 569 F.3d 349, 353 (8th Cir. 2009) ("'Whether a federal court should certify a question to a state court is a matter of discretion'") (quoting *Johnson v. John Deere Co.*, 935 F.2d 151, 153 (8th Cir. 1991)); *see also Anderson v. Hess Corp.*, 649 F.3d 891, 891 (8th Cir. 2011); *Jung v. General Cas. Co.*, 651 F.3d 796, 796 (8th Cir. 2011); *Packett v. Senberg*, 969 F.2d 721, 726 (8th Cir. 1992).

I previously articulated the following factors to be considered in determining whether to certify a question to the state's highest court:

> (1) the extent to which the legal issue under consideration has been left unsettled by the state courts; (2) the availability of legal resources which would aid the court in coming to a conclusion of the legal issue; (3) the court's familiarity with the pertinent state law; (4) the time demands on the court's docket and the docket of the state supreme court; (5) the frequency that the legal issue in question is likely to recur; [] (6) the age of the current litigation and the possible prejudice to the litigants which may result from certification [; and (7)] whether there is any split of authority among those jurisdictions that have considered the issues presented in similar or analogous circumstance.

*Hagen v. Siouxland Obstetrics & Gynecology, P.C.*, 964 F. Supp. 2d 951, 961 (N.D. Iowa 2013) (internal citations and quotations omitted) ((quoting *Leiberkneckt v. Bridgestone/Firestone, Inc.*, 980 F. Supp. 300, 310 (N.D. Iowa 1997); *accord Erickson-Puttmann v. Gill*, 212 F. Supp. 2d 960, 975 n.6 (N.D. Iowa 2002); *see Olympus Alum. Prod. v. Kehm Enters., Ltd.*, 930 F. Supp. 1295, 1309 n.10 (N.D. Iowa 1996) (citing *Rowson v. Kawasaki Heavy Indus., Ltd.*, 866 F. Supp. 1221, 1225, n.5 (N.D. Iowa

1994)).  An extensive analysis of all factors is unwarranted in this case, as explained below.

### B.    *Certification Analysis*

Although I agree with the defendants that the seven factor test I outlined *Hagan* probably weighs against certification in this case, I am going to certify it anyway.  964 F. Supp. 2d at 961.  I would have to reject the thoughtful, creative, novel, and well-argued positions of DMWW, as unsupported by Iowa law and unlikely to be adopted by the Iowa Supreme Court, if I did not certify these questions.  But, without certification, I would be substituting my judgment of Iowa law in lieu of the seven justices of the Iowa Supreme Court.  In light of the novelty of DMWW's state law arguments, the fact that this case is one of first impression, for either this court or the Iowa Supreme Court, and the public importance of this case, I believe that the interests of the parties and the public are best served by a definitive adjudication of these state law issues by the ultimate authority on them - the Iowa Supreme Court.  Given the importance of these questions, I find no serious prejudice to the defendants by certifying these questions to the Iowa Supreme Court, despite their forceful resistance to certification.

### C.    *Briefing Designation*

According to Iowa Rule of Appellate Procedure 6.302(1)(b)(4), if questions are certified to the Iowa Supreme Court on this court's own, *sua sponte*, motion, I shall designate the party to file the first brief.  I designate the **plaintiff** to file the first brief before the Iowa Supreme Court in accordance with Iowa Rules of Appellate Procedure 6.302 and 6.303.

## IV. CONCLUSION

Here, I find that the questions identified earlier in this Order involve matters of Iowa law best answered, in the first instance, by the Iowa Supreme Court.

**IT IS SO ORDERED.**

**DATED** this 11th day of January, 2016.

_____
MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA